Filed 3/18/24  P. v. Williams CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>NORMAN WILLIAMS,<br><br>　　　Defendant and Appellant. | B324074<br><br>(Los Angeles County<br>Super. Ct. No. BA131114) |

　　　APPEAL from an order of the Superior Court of Los Angeles County, Stephen A. Marcus, Judge.  Affirmed.

　　　Patricia S. Lai, under appointment by the Court of Appeal, for Defendant and Appellant.

　　　Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, and Heidi Salerno, Deputy Attorney General, for Plaintiff and Respondent.

# INTRODUCTION

Norman Williams, who with codefendant Omar Walker was convicted in 1997 of (among other crimes) murder, appeals from the superior court's order following an evidentiary hearing denying his petition for resentencing under Penal Code section 1172.6.[1] Williams argues substantial evidence did not support the court's finding he could still be convicted of murder as a major participant in an underlying felony who acted with reckless indifference to human life. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *A Jury Convicts Williams of First Degree Murder, and We Affirm*

One evening in November 1995, Williams and Walker entered a restaurant owned by Joseph Beharry. Beharry was upstairs in a loft area watching a basketball game and smoking marijuana with Anthony Samuels and Robert Cross. Timothy Hinds, who worked and lived in the restaurant, was dressing in the loft. The restaurant had recently closed, and Anthony Brock was downstairs cleaning up. The staircase leading to the loft from the restaurant was L-shaped, with a landing in the middle.

Williams and Walker entered the restaurant, walked up to the loft, and pointed their guns at the men there.[2] Walker went

---

[1] Statutory references are to the Penal Code.

[2] There were some discrepancies in the testimony of Samuels, Cross, Hinds, and Brock at trial (which occurred almost

2

back downstairs and brought Brock to the loft at gunpoint. Williams told the men to get down. Cross heard Williams and Walker say they were going to rob the men; they also argued with Beharry as if they knew him. Williams searched the men, found and took a gun from Samuels, and took money and personal possessions from the other men. Williams told Walker to go downstairs to get something to use to tie up the men. Walker returned with aprons and cords, and he and Williams tied up the men in the loft.

Meanwhile, Williams demanded thousands of dollars from Beharry and became increasingly angry. Cross heard Williams say that he "wanted all the money and all the weed" and that "he was going to kill everybody." Samuels and Brock also said Williams threatened to kill them. Brock said Williams was doing most of the talking and appeared to be "in charge." Beharry called Williams by his name and told Williams he had $5,000 at his house. Williams said, "'Don't call my name. Don't call my name. I need more than that.'" He asked Beharry, "'Where is the weed at?'" and searched the loft. Williams also told Beharry, "'If I find anything more in your pocket, I am going to kill you.'" Williams kicked Beharry "worse than a dog" in his ribs, chest,

_____

two years after the murder). None of the discrepancies, however, undermines the evidence supporting the superior court's finding Williams was an active participant in the robbery and acted with reckless indifference to human life. (See *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 161-162 ["'[w]e resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence'"]; *People v. Coelho* (1945) 68 Cal.App.2d 705, 706 ["discrepancies in testimony, if any; . . . cannot be considered by us if, as in the instant case, there is substantial evidence to support the findings of the trier of fact"].)

and face.  Williams also kicked Samuels and said he was going to kill him because Williams (who is Jamaican) believed Samuels was "'going around talking about Jamaicans this and Jamaicans that.'"

Beharry told Williams and Walker there was a lot of money in the cash register downstairs, and both men left the loft. Beharry managed to free himself and followed Williams and Walker.  As Beharry walked downstairs, Williams asked Beharry, "'Where you going?  Go back upstairs.'"  Samuels heard feet shuffling on the stairs and a gun shot.  Brock heard Beharry wrestling with someone on the landing and more than two gunshots.  Beharry called out, "'You guys come help me.  Come help me.  Come help me.'"  Samuels managed to free himself, but when he reached the top of the stairs he heard another gun shot and ran to find a hiding place.  As he passed a window that looked into the restaurant he saw Williams and Walker run out the front door.  Only coins remained in the cash register.

Beharry walked back upstairs holding the railing and said, "'Those guys shot me in my belly.'"  Beharry was shot three times and died from his wounds.  Walker also suffered a gunshot wound to his thigh.  A police officer investigating the scene found three .45 caliber bullet casings and bullet fragments indicating shots fired in different directions, both above and below the landing.

The People charged Williams with five counts of robbery (§ 211) and one count of first degree murder (§ 187, subd. (a)) and alleged Williams committed murder while he was engaged in the commission of robbery (§ 190.2, subd. (a)(17)).  The People also alleged Williams personally used a firearm in the commission of murder and robbery.  (§ 12022.5, subd. (a).)

4

The trial court instructed the jury on felony murder and direct aiding and abetting. The court also instructed the jurors that they could find Williams guilty of murder under the natural and probable consequences doctrine if they found Williams aided and abetted Walker in committing robbery and the murder was a natural and probable consequence of the robbery.

The jury convicted Williams of first degree murder and robbery as charged and found true the felony-murder and firearm allegations. The trial court sentenced Williams to a term of life in prison without the possibility of parole for the murder conviction, plus a total of 23 years for the robbery counts and the firearm enhancements. We affirmed the judgment. (*People v. Williams et al.* (May 12, 1999, B118216) [nonpub. opn.] (*Williams I*).)

B. *The Superior Court Denies Williams's Petition for Resentencing Under Section 1172.6*

In March 2021 Williams filed a petition for resentencing under former section 1170.95, now section 1172.6. Williams alleged the People proceeded against him under a theory of felony murder or murder under the natural and probable consequences doctrine, that he was convicted of first or second degree murder under one of those theories, and that he could not now be convicted of first or second degree murder because of legislative changes to sections 188 and 189. The superior court appointed counsel to represent Williams, and the People conceded the court should issue an order to show cause and schedule an evidentiary hearing.

5

### 1. *Walker and Williams Testify at the Evidentiary Hearing*

The court held an evidentiary hearing on July 28, 2022. Williams and Walker testified. Like Williams, Walker was convicted of murdering Beharry and sentenced to life in prison without the possibility of parole, but the Governor commuted his sentence, and he was granted parole. Walker testified that on the day of the murder he arranged to buy 40 pounds of marijuana from Beharry, from whom he had bought marijuana "numerous times." Walker said that Beharry told him to come to the restaurant at closing time and that Walker told Beharry he would bring Williams, who was Walker's "partner" and planned to buy half the marijuana. Walker said he went to the restaurant armed with a gun. He said that Williams did not have a gun, but that Williams knew Walker was armed. Walker testified, "You have to bring a weapon with you in that type of lifestyle because . . . I was going to buy $40,000 worth [of marijuana]" and "don't want nobody to rob me."[3] Walker said he expected Beharry and anyone with him might also be armed because, "[i]n that line of business, don't nobody trust each other." Even before going into the restaurant, Walker said, he knew there was a potential for violence.

Walker stated that, after he and Williams arrived at the restaurant, Beharry waved him and Williams up to the loft where there were several other men. Walker said that because Samuels "started to put his hand underneath his shirt," which signaled he

---

[3] Walker explained that the street value of the marijuana he planned to buy was $40,000 to $60,000, but that it would cost him about $8,500 or $9,000 to buy it from Beharry. He said he had $3,500 with him that night.

was reaching for a weapon, Walker pulled out his gun and told Samuels not to move. Walker told Williams to search everyone in the loft, and Williams found Samuels's gun. Walker accused Beharry of trying to set him up, and Williams suggested "in that moment" that he and Walker rob the others. (Walker later testified it was his idea to rob Beharry and the other men.) Walker said Williams held the others at gunpoint while Walker went downstairs to get Brock, also at gunpoint, along with some aprons to use to tie up the others.

Walker testified he kicked Beharry and Samuels while they were tied up "because they were . . . shouting expletives." Walker said that Williams also yelled profanities, but that Williams did not threaten to kill anyone. The prosecutor asked Walker about his statement to the parole board that Williams had threatened to kill the men in the loft. Walker reiterated he did not remember Williams threatening to kill anyone. Walker said he told the men that he and Williams were not going to kill them and that they were "just trying to get what [they] trying to get and leave."

Walker said Williams left the loft after they robbed the men. Walker stated that he followed Williams and that, about halfway down the stairs, Beharry got free from his restraints and rushed toward Walker. Walker and Beharry "got into a struggle" over Walker's gun, and the gun fired three times, striking both Walker and Beharry. Walker said he knew Beharry was hit because Beharry said (in Patois),[4] "'Imma get shot. Imma get

---

[4]    Patois is "the national language of Jamaica." (*U.S. v. Brown* (C.D.Cal., Feb. 5, 2018, No. 2:17-CR-00047(A)-CAS) 2018 WL 739268, p. 12.) It is "an English-based creole language

7

shot.'" Walker stated that, when Beharry was shot, Williams was at the bottom of the stairs on his way out of the restaurant and was not involved in the struggle with Beharry. Walker testified he left the restaurant with Williams. At his parole hearing, Walker took responsibility for shooting Beharry.

On cross-examination the prosecutor asked whether the executive order commuting Walker's sentence stated Williams "shot and killed the victim." Walker conceded that the order stated that, but said that "a lot of the stuff they had in there was not correct." The prosecutor also asked Walker why he told the parole board "we shot" Beharry after Beharry ran toward Walker and Williams. Walker admitted he did not know whether Williams had also fired his gun, but he said the bullet that killed Beharry was from a .45 caliber weapon like the one Walker had that night. The prosecutor also asked Walker about his statement to detectives after his arrest that Williams tied up the men and made them "plead for their lives." Walker said he lied to detectives because he was scared.

Williams also testified at the evidentiary hearing. He said he had known Walker for more than four years before the murder and did not know him to be violent. Williams and Walker had bought and sold drugs together more than 10 times, and Williams had bought drugs from Beharry multiple times. Williams said he had over $10,000 with him when he went to the restaurant. He denied having a weapon when he entered the restaurant but said he knew Walker was armed. Williams said that he and Walker intended to buy marijuana from Beharry, but that the plan

---

with West African influences." (*Brown v. Thomas* (M.D.Fla., Mar. 24, 2022, No. 3:20-CV-726-BJD-MCR) 2022 WL 874357, p. 1, fn. 2.)

"spontaneously" and "instantly" changed after Walker drew his weapon. Williams said that in that moment he and Walker just wanted to protect themselves. Williams said Walker motioned to him to search the men in the loft, and he found a .38 caliber gun on Samuels. Williams admitted pointing the gun at people, but he said he did not threaten to kill anyone. Williams said he did not find any other weapons and at that time he did not take anything else from the men. He said Walker told him to go downstairs to get Brock, and Williams put Samuels's gun in his pocket and brought Brock upstairs with the gun still in his pocket. Williams said he tied up the men with an apron Hinds was wearing and telephone cords Williams found in the loft.

Williams also said they asked Beharry where the "weed" was, and Beharry told them they came too early; Beharry seemed irritated Walker had a gun. Williams said Walker kicked Beharry and told Williams to search the men again and take anything of value. Williams denied kicking Beharry or hitting anyone. Williams stated that, after he searched the others and took what money he could find, he searched the loft for the marijuana. When he did not find any, he told Walker, "'Let's go,'" and went downstairs.

Williams said that he was in the middle of the restaurant, about 12 feet in front of Walker, when he heard a gunshot, but that he did not see a struggle. Williams said he did not turn around, and instead ran out of the restaurant, jumped in his car, and picked up Walker as Walker ran out of the restaurant. Williams testified he did not intend to rob or kill anyone in the restaurant. He also said he "was just following [Walker's] lead" in robbing the men.

On cross-examination, Williams testified he heard "rumbling" behind him as he was leaving the restaurant and someone said, "'Come help me.'" Williams stated, "I looked back, but no one [was] behind me. Then I heard a shot and I run out the door." Williams said he did not offer help to anyone.

2.     *The Superior Court Denies Williams's Petition*

The superior court stated it reviewed the clerk's transcript and the reporter's transcript from Williams's trial, which the People submitted. The court ruled Williams was ineligible for relief under section 1172.6 because the People proved beyond a reasonable doubt Williams could still be convicted for murder as a major participant in a robbery who acted with reckless indifference to life.[5] The court first found Walker and Williams were not credible witnesses. The court stated Walker was motivated to help his friend without doing harm to himself. The court found that Walker and Williams had "selective memory" and that Walker's testimony differed from what he told the parole board. The court also found Walker's and Williams's testimony was inconsistent with the trial testimony of Samuels, Cross, Hinds, and Brock, none of whom, unlike Walker and Williams, had reason to mislead the court. The court observed that, although the testimony at trial was not entirely consistent,

---

[5]     The superior court also found the People proved beyond a reasonable doubt Williams was a direct aider and abettor who acted with intent to kill. We do not address aider and abettor liability because we conclude substantial evidence supported the court's finding Williams could be convicted of murder as a major participant in the robbery who acted with a reckless indifference for life.

10

the witnesses generally identified Williams as the "one giving the orders" and "the one making all the threats and beating up people."

The court stated it was not crediting "the whole gist" of Walker and Williams's story, which was that they planned to buy 40 pounds of marijuana and that, "because one person had his hand near his waist, . . . Walker decided to change suddenly from making a lucrative drug deal to an armed robbery." The court found more "logical" the version of the story described at trial, which was that Walker and Williams went to the restaurant intending to rob Beharry. Among other evidence, the court concluded that no one found 40 pounds of marijuana at the restaurant because "there was never any deal to sell 40 pounds of marijuana."

Regarding whether Williams was a major participant in the robbery, the court found: (1) Williams "was the leader of the plan to rob" Beharry; (2) Williams was armed, but even if he wasn't when he entered the restaurant, he subsequently armed himself; (3) Williams was aware of the danger posed by the armed robbery because he expected some "resistance" from a known drug dealer; (4) Williams was present at the killing and was in a position to facilitate or prevent the murder; (5) Williams was one of two shooters, and "his words and actions led to the shooting of [Beharry] and probably encouraged [Walker]"; and (6) Williams made no effort to help Beharry.

Regarding whether Williams's conduct reflected reckless indifference to human life, the court found: (1) Williams brought a gun to the robbery and knew Walker had a gun; (2) Williams was present at the murder; (3) Williams had an opportunity to restrain Walker, even under Williams's version of events, and he

could have aided Beharry after he was shot; (4) the duration of the robbery made it more likely someone would be killed; (5) there was no evidence Williams knew Walker had a propensity for violence; and (6) Williams made no effort to minimize the risk of violence, and increased the risk of violence by threatening to kill hostages, beating up Beharry, choosing to commit robbery when a number of people were present, and choosing to commit robbery at a location known for selling drugs. The court concluded all but one of the factors (the fifth) weighed in favor of finding Williams acted with reckless indifference to human life. The court denied Williams's petition, and Williams timely appealed.

## DISCUSSION

A. *Section 1172.6*

Effective 2019, the Legislature substantially modified the law governing accomplice liability for murder, eliminating the natural and probable consequences doctrine as a basis for finding a defendant guilty of murder (*People v. Curiel* (2023) 15 Cal.5th 433, 448; *People v. Reyes* (2023) 14 Cal.5th 981, 986; *People v. Gentile* (2020) 10 Cal.5th 830, 842-843) and significantly narrowing the felony-murder exception to the malice requirement for murder (§§ 188, subd. (a)(3), 189, subd. (e); see *People v. Strong* (2022) 13 Cal.5th 698, 707-708; *People v. Lewis* (2021) 11 Cal.5th 952, 957). Section 188, subdivision (a)(3), now prohibits imputing malice based solely on an individual's participation in a crime and requires proof of malice to convict a principal of murder, except under the revised felony-murder rule in section 189, subdivision (e). That provision requires the People

12

to prove specific facts relating to the defendant's culpability: The defendant was the actual killer (§ 189, subd. (e)(1)); the defendant, though not the actual killer, with the intent to kill assisted in the commission of the murder (§ 189, subd. (e)(2)); or the defendant was a major participant in a felony listed in section 189, subdivision (a), and acted with reckless indifference to human life, "as described in subdivision (d) of Section 190.2," the felony-murder special-circumstance provision (§ 189, subd. (e)(3)). (See *Curiel*, at p. 448; *Strong*, at p. 708.)

Section 1172.6 authorizes an individual convicted of felony murder or murder based on the natural and probable consequences doctrine to petition the superior court to vacate the conviction and be resentenced on any remaining counts, if he or she could not now be convicted of murder because of the changes the Legislature made effective 2019 to the definitions of the crime. (See *People v. Curiel, supra*, 15 Cal.5th at pp. 449-450; *People v. Strong, supra*, 13 Cal.5th at p. 708; *People v. Lewis, supra*, 11 Cal.5th at p. 957.) If a section 1172.6 petition contains all the required information, the court must appoint counsel to represent the petitioner, if requested. (*Lewis*, at pp. 962-963; see § 1172.6, subd. (b)(1)(A), (3).) The prosecutor must then file a response to the petition, the petitioner may file a reply, and the court must hold a hearing to determine whether the petitioner has made a prima facie showing he or she is entitled to relief. (§ 1172.6, subd. (c).)

Where, as here, the petitioner has made a prima facie showing he or she is entitled to relief under section 1172.6, the court must issue an order to show cause and hold an evidentiary hearing to determine whether to vacate the murder conviction and resentence the petitioner on any remaining counts.

(§ 1172.6, subd. (d)(1).) At that hearing the court may consider evidence "previously admitted at any prior hearing or trial that is admissible under current law," including witness testimony. (§ 1172.6, subd. (d)(3).) The petitioner and the prosecutor may also offer new or additional evidence. (*Ibid*.; see *People v. Gentile*, *supra*, 10 Cal.5th at pp. 853-854.)

On appeal from an order denying a petition under section 1172.6, we review the superior court's factual findings for substantial evidence. (*People v. Montanez* (2023) 91 Cal.App.5th 245, 270; *People v. Guiffreda* (2023) 87 Cal.App.5th 112, 125.)[6] "In reviewing the trial court's findings for substantial evidence, we . . . examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding

---

[6] Citing *People v. Vivar* (2021) 11 Cal.5th 510, Williams argues we should independently review the superior court's findings of fact because they were based "only on documentary evidence." But Williams and Walker testified at the evidentiary hearing, and the court considered their testimony in making its findings. Moreover, *Vivar* applied an independent standard of review to findings made in connection with a motion under section 1473.7, not section 1172.6. (See *Vivar*, at pp. 527 & 528, fn. 7 ["Nothing we say here disturbs a familiar postulate: when reviewing a ruling under the substantial evidence standard, 'an appellate court should defer to the factual determinations made by the trial court,' regardless of 'whether the trial court's ruling[s are based] on oral testimony or declarations.'"]; *People v. Mitchell* (2022) 81 Cal.App.5th 575, 590-591 [rejecting the petitioner's argument based on *Vivar* that an independent standard of review applies to fact findings under section 1172.6 when there is no live testimony].)

14

[the necessary fact] beyond a reasonable doubt. . . .  While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt."  (*People v. Pittman* (2023) 96 Cal.App.5th 400, 414, internal quotation marks omitted; see *Montanez*, at pp. 270-271; *Guiffreda*, at p. 125.)  "'"Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence."'"  (*People v. Navarro* (2021) 12 Cal.5th 285, 339; see *People v. Brooks* (2017) 3 Cal.5th 1, 57; *Montanez*, at p. 271.)

> B.  *Substantial Evidence Supported the Superior Court's Finding Beyond a Reasonable Doubt Williams Is Not Entitled to Relief Under Section 1172.6*

> 1.  *Applicable Law*

Section 189, subdivision (e)(3), provides that a participant in one of the felonies listed in section 189, subdivision (a) (which includes robbery), may be liable for murder if the prosecution proves he or she "was a major participant in the underlying felony and acted with reckless indifference to human life," within the meaning of section 190.2, the special circumstances statute. (*People v. Curiel*, *supra*, 15 Cal.5th at p. 448; *People v. Strong*, *supra*, 13 Cal.5th at p. 708; see § 190.2, subds. (a), (d).)  The Supreme Court in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*) "clarified the meaning of the special circumstances statute" (*In re Scoggins* (2020) 9 Cal.5th 667, 676) and identified "a nonexhaustive list of

15

considerations" relevant to determining whether a defendant was culpable for murder under section 189, subdivision (e)(3) (see *Strong*, at pp. 706-707; *People v. Ramirez* (2021) 71 Cal.App.5th 970, 986).

Among the factors that "may play a role in determining whether a defendant's culpability is sufficient" for a finding he or she was a major participant under section 190.2, subdivision (d), are: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Banks*, *supra*, 61 Cal.4th at p. 803, fn. omitted; see *People v. Cody* (2023) 92 Cal.App.5th 87, 105-106; *People v. Mitchell, supra,* 81 Cal.App.5th at p. 591.) "No one of these considerations is necessary, nor is any one of them necessarily sufficient. All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major.'" (*Banks*, at p. 803; see *Cody*, at p. 106.)

"Reckless indifference to human life has a subjective and an objective element. [Citation.] As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death

16

his or her actions create.' [Citations.] As to the objective element, "'[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.'"'" (*In re Scoggins, supra*, 9 Cal.5th at p. 677; see *People v. Cody, supra*, 92 Cal.App.5th at p. 106.) "Awareness of no more than the foreseeable risk of death inherent in any armed crime is insufficient; only knowingly creating a 'grave risk of death' satisfies the constitutional minimum." (*Banks, supra*, 61 Cal.4th at p. 808; see *Scoggins*, at p. 677.)

"In addition to the *Banks* and *Clark* factors, a defendant's youthful age must be considered" in determining whether the defendant had a reckless indifference for human life. (*People v. Jones* (2022) 86 Cal.App.5th 1076, 1088, fn. 7; see *People v. Ramirez, supra*, 71 Cal.App.5th at p. 987 ["'a defendant's youth is a relevant factor in determining whether the defendant acted with reckless indifference to human life'"].) In making that determination, "'[w]e analyze the totality of the circumstances' in a manner that largely overlaps with our 'major participant' discussion." (*People v. Cody, supra*, 92 Cal.App.5th at p. 106; see *In re Scoggins, supra*, 9 Cal.5th at pp. 676-677; *In re Moore* (2021) 68 Cal.App.5th 434, 455.) "Although we state these two requirements separately, they often overlap" because "the greater the defendant's participation in the felony murder, the more likely that he [or she] acted with reckless indifference to human life." (*Clark, supra*, 63 Cal.4th at p. 615 [internal quotations omitted]; *Cody*, at p. 106; see *People v. Montanez, supra*, 91 Cal.App.5th at p. 268.)

17

2. *Substantial Evidence Supported the Superior Court's Finding Williams Was an Active Participant in the Robbery*

Williams argues substantial evidence did not support the superior court's finding he was an active participant in the robbery. But it did.

First, Williams played a significant role in planning and leading the criminal enterprise that led to the armed robbery and Beharry's death. Upon arriving in the loft, Williams pointed his gun at the men and told them to get down on the ground. He was "in charge," did "most of the talking," took the lead in searching and robbing the victims, grabbed Samuels's gun, told Walker to go downstairs to get something to tie up the victims, and demanded money from Beharry. Even if Williams did not "singlehandedly plan[ ] the robbery" (*In re Bennett* (2018) 26 Cal.App.5th 1002, 1019), he was instrumental in carrying it out.

Williams cites an excerpt from our opinion in *Williams I* that stated, "It appeared to Brock that Walker was in charge." The superior court did not err in declining to consider this statement at the evidentiary hearing. (See § 1172.6, subd. (d)(3) [the court may "consider the procedural history of the case recited in any prior appellate opinion"]; *People v. Arnold* (2023) 93 Cal.App.5th 376, 392 ["The specificity of this provision 'indicates the Legislature has decided trial judges should not rely on the factual summaries contained in prior appellate decisions when a section [1172.6] petition reaches the stage of a full-fledged evidentiary hearing.'"]; *People v. Flores* (2022) 76 Cal.App.5th 974, 988 ["the factual summary in an appellate opinion is not evidence that may be considered at an evidentiary

18

hearing to determine a petitioner's eligibility for resentencing"]; cf. *People v. Vance* (2023) 94 Cal.App.5th 706, 714 ["when an appellate opinion is admitted at an evidentiary hearing under section 1172.6, without objection, it is substantial evidence that the trial court can consider," and by failing to object, the petitioner can forfeit "any objection to such consideration"].) In any event, Brock testified that it was Williams who told him "to cooperate" and "to get on the ground" and that Williams suggested to Walker that he search the men.

Second, Williams admittedly was armed and used a gun during the robbery. Third, while there is no evidence Williams knew of Walker's propensity for violence based on past experience, Williams admitted knowing Walker was armed, from which the superior court could reasonably infer Williams also knew that buying 40 pounds of marijuana from a known drug dealer could involve danger. Williams also testified Walker was the one who kicked Beharry and others, which meant Williams knew something about Walker's propensity for violence well before Beharry was shot.

Fourth, Williams admittedly was present at the scene of the murder and may have been a shooter. Indeed, Beharry said "those guys" shot him, Walker told the parole board that "we" shot Beharry, and the forensics evidence was consistent with the scenario that two guns were fired. At a minimum, Williams's actions facilitated the murder by creating a credible threat of death throughout the robbery. Williams held the hostages at gun point, repeatedly threatened to kill them, kicked and beat Beharry and Samuels, and tied up the hostages or directed Walker to tie them up. Williams also had opportunities to prevent Beharry's murder by, for example, leaving (or suggesting

19

to Walker that they leave) the restaurant after failing to find money or drugs. (See *People v. Cody*, *supra*, 92 Cal.App.5th at p. 114 [defendant who participated in the victim's beating before his strangulation had an opportunity to stop the killing].) Even under Williams's version of events, he did nothing to prevent the murder, such as leaving the restaurant after the supposed drug deal proved unsuccessful rather than holding five hostages at gunpoint. And after Beharry was shot, Williams admittedly did nothing to help him. Substantial evidence amply supported the superior court's finding Williams was a major participant in the robbery. (See *People v. Jones*, *supra*, 86 Cal.App.5th at p. 1088 [defendant was a major participant where he voluntarily participated in a robbery that led to murder, was armed, knew the dangers posed by robbing a drug dealer, was present at the scene of the botched robbery and shooting, and made no effort to minimize the risk of violence during the robbery]; *People v. Mitchell*, *supra*, 81 Cal.App.5th at p. 591 [defendant was a major participant where he helped plan a robbery, pointed a gun at the victim but did not fire it, split the stolen money, and "was a full partner in crime"].)

Williams argues that his role in the robbery did not contribute to Beharry's death and that "there is no evidence that he had 'any intention of participating in or facilitating a murder.'" (See *Enmund v. Florida* (1982) 458 U.S. 782, 798.) That might be true in Williams's version of events, but not in the version the jury and the superior court believed. Three different witnesses with no motivation to lie said that Williams threatened to kill them and that he backed up his threats with violence by severely beating Beharry and kicking Samuels. While the killing may have occurred during a struggle, that does not diminish

20

Williams's significant involvement in the robbery. Consistent with the purpose of the "'major participant' element" to "reflect 'the defendant's individual responsibility for the loss of life, not just his or her vicarious responsibility for the underlying crime,'" Williams had significant individual responsibility for Beharry's death. (*People v. Madrigal* (2023) 93 Cal.App.5th 219, 238, italics omitted.)

### 3. *Substantial Evidence Supported the Superior Court's Finding Williams Acted with Reckless Indifference to Human Life*

As discussed, the factors for determining whether a defendant acted with reckless indifference to human life overlap to some degree with the factors for determining whether the defendant was a major participant. Indeed, the superior court's "factual finding that [the defendant] was a major participant in the underlying felony is—itself—supportive of the court's additional factual finding that [the defendant] acted with reckless indifference to human life." (*People v. Cody, supra,* 92 Cal.App.5th at p. 113; see *In re Scoggins, supra,* 9 Cal.5th at p. 677.) The overlapping factors here were that Williams used a gun in committing the robbery, that he was physically present at the robbery and murder, that he did not attempt to aid Beharry, that there was little to no evidence Williams knew of Walker's history of or propensity for violence (a factor weighing against a finding of reckless indifference to human life), and that Williams made no effort to minimize the risk of violence during the robbery. (See *Scoggins,* at p. 677 [listing the factors].) All but one of these factors weigh in favor of finding Williams acted with reckless indifference to human life.

21

The evidence regarding the other factors, including the number of weapons used in the crime, the duration of the crime, and Williams's opportunity to "restrain the crime" (*In re Scoggins, supra*, 9 Cal.5th at p. 677) similarly supported the superior court's finding Williams acted with reckless indifference to human life. The crime involved three guns: the gun Williams brought with him (caliber unknown), the gun Williams took from Samuels (a .38 caliber), and the gun Walker brought with him (a .45 caliber). Unlike in *Clark*, where there was only one gun at the scene of the killing, the defendant did not carry that gun, and the gun was loaded with only one bullet, here Williams had two guns, pointed one of them at the victims, and threatened to kill them. (See *Clark*, *supra*, 63 Cal.4th at p. 618.) Williams's use of a firearm, even if Walker killed Beharry, supported the court's finding Williams had a reckless indifference to human life. (See *ibid*.)

Regarding the duration of the robbery, Samuels testified it lasted 20 to 30 minutes, Brock said 30 minutes, and Cross said "less than 10" minutes. However long within that range the robbery lasted, it involved multiple interactions with victims who were bound and had guns pointed at them, which created "'a greater window of opportunity for violence' [citation], possibly culminating in murder." (*Clark*, *supra*, 63 Cal.4th at p. 620; see *People v. Cody*, *supra*, 92 Cal.App.5th at p. 114 [evidence the defendant "spent more than a fleeting amount of time" searching the property supported the court's finding the defendant acted with reckless indifference to life]; *People v. Montanez*, *supra*, 91 Cal.App.5th at p. 283 [evidence the victims were bound and held at gunpoint for 25 minutes supported the court's finding the defendant acted with reckless indifference to human life]; cf. *In re*

*Scoggins*, *supra*, 9 Cal.5th at p. 680 [duration of the crime did not indicate reckless indifference to human life where the defendant did not detain the victims and the interaction lasted no more than five minutes]; *People v. Madrigal*, *supra*, 93 Cal.App.5th at p. 250 [attack and robbery lasting 39 seconds were not over such a "'prolonged period'" that it would have created a greater opportunity for violence]; *People v. Guiffreda*, *supra*, 87 Cal.App.5th at p. 128 [assault and robbery lasting "mere minutes" did not create a greater opportunity for violence].)

Williams argues he did not have an opportunity to prevent Beharry's murder because the shooting was "spontaneous." Williams's presence and proximity to the killing (which he admitted was approximately 12 feet), however, "provide[d] an opportunity to act as a restraining influence." (*People v. Bradley* (2021) 65 Cal.App.5th 1022, 1033.) Moreover, while Williams may not have intended that he and Walker would use their firearms, "the evidence concerning the manner in which they carried out the robbery is sufficiently weighty to support" the superior court's finding Williams "acted in reckless disregard for human life." (*People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1090; see *id.* at pp. 1089-1090 [defendant acted with reckless indifference to human life where he and his accomplice pushed their way into a drug dealer's apartment, and the defendant made the person who answered the door lie face down at gunpoint, while the defendant's accomplice shot the drug dealer in a bedroom after a brief struggle].) Had Williams wanted to avoid violence, he would not have walked into the loft brandishing a gun and held five men at gunpoint. (See *ibid.* [circumstances "strongly suggest[ed] confronting people . . . was part of the plan"].) As soon as Williams and Walker

encountered multiple potential victims that complicated their plan to rob Beharry, they could have called it off. Instead, they escalated the violence.

More generally, Williams argues the evidence showed no more than a "'garden-variety armed robbery, where death might be possible but not probable.'" (*Banks*, *supra*, 61 Cal.4th at p. 802.) Indeed, the Supreme Court in *Clark* stated there must be something "in the plan that one can point to that elevated the risk to human life beyond those risks inherent in any armed robbery" to show reckless indifference for human life. (*Clark*, *supra*, 63 Cal.4th at p. 623.) The Supreme Court in *Clark* also stated "garden-variety armed robbery" was a "robbery in which the only factor supporting reckless indifference to human life is the fact of the use of a gun." (*Id.* at p. 617, fn. 74.) As discussed, there was much more to the armed robbery here. Williams tied up the victims, kicked and beat them, and repeatedly threatened to kill them, all while two guns were pointed at them. And courts have held that targeting a known drug dealer in his or her home (and the loft was a private area analogous to a home; it even had a shower) is inherently dangerous. (See *People v. Bascomb*, *supra*, 55 Cal.App.5th at p. 1090 ["'the planned, armed robbery of a known drug dealer at his residence'" carried a significant risk of violence]; *In re McDowell* (2020) 55 Cal.App.5th 999, 1013 [a home invasion robbery of a drug dealer is "a crime with a particularly high risk of violence"].)

Finally, Williams argues the superior court, in considering whether Williams acted with reckless indifference to human life, erred in failing to consider Williams's relative youth. Williams, who was 23 years old at the time of the murder, did not argue in the superior court his youth affected his perception of the risk

24

involved in armed robbery.  In response to the People's forfeiture argument, Williams argues that cases decided since his evidentiary hearing have "made clear that youth is relevant to [the] reckless indifference analysis" and that the law now requires the superior court to take youth into account.

That's not quite what happened.  As stated, Williams's evidentiary hearing occurred on July 28, 2022.  In November 2021, eight months before Williams's evidentiary hearing, this court in *People v. Ramirez, supra*, 71 Cal.App.5th 970 held "'a defendant's youth is a relevant factor in determining whether the defendant acted with reckless indifference to human life.'" (*Id.* at p. 987.)  In *In re Moore, supra*, 68 Cal.App.5th 434, decided earlier that year, the court vacated a robbery-murder special-circumstance finding, concluding that, even if the *Clark* factors supported a finding of reckless indifference to human life for an adult, a 16-year-old boy "lacked '"the experience, perspective, and judgment"' to adequately appreciate the risk of death posed by his criminal activities."  (*Moore*, at p. 454.)[7]

We need not decide whether Williams forfeited his youth-factor argument because any error by the superior court in failing to consider Williams's relative youth was harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836.  (See *People v. Pittman, supra*, 96 Cal.App.5th at pp. 417-418 [applying the *Watson*

---

[7]      In *People v. Jones, supra*, 86 Cal.App.5th 1076, decided five months after Williams's evidentiary hearing, the court held that, "[i]n addition to the *Banks* and *Clark* factors, a defendant's youthful age *must* be considered" (*Jones*, at p. 1088, fn. 7, italics added) when determining whether a defendant "was a major participant and acted with reckless indifference to human life based on the *totality* of the circumstances."  (*Id.* at p. 1091.)

25

harmless error standard to the superior court's failure to consider the petitioner's age in determining whether he acted with reckless indifference to human life]; *People v. Oliver* (2023) 90 Cal.App.5th 466, 489 & fn. 8 [same]; see also *People v. Epps* (2001) 25 Cal.4th 19, 29 [*Watson* standard applies to the denial of a right that "is purely a creature of state statutory law"].)

"The cases discussing the role of youth in relation to criminal culpability stress two areas: youthful offenders' relative impulsivity and their vulnerability to peer pressure. [Citation.] Transient rashness, impetuosity, and failure to appreciate risks and consequences are hallmarks of an immature brain." (*People v. Pittman*, *supra*, 96 Cal.App.5th at p. 418, internal quotation marks omitted; see *People v. Oliver*, *supra*, 90 Cal.App.5th at p. 489.) The court in *Oliver* held these factors were not present where the 23-year-old defendant "actively participated" in a plan to buy a large amount of cocaine from a dealer whom his accomplice shot after the drug deal. (*Oliver*, at pp. 470-471, 489.) There was "no evidence that [the defendant] planned the crime, supplied a weapon, or carried a weapon" (*id.* at p. 483), but his accomplice told him before the drug deal he planned to kill the victim "if he was alone" (*id.* at p. 470). The court in *In re Harper* (2022) 76 Cal.App.5th 450 similarly concluded a 16-year-old's youth did not diminish his culpability for murder where an older accomplice killed the manager of a store they robbed together. (*Id.* at pp. 454-455.) The court held the juvenile's conduct during the robbery (including giving the actual killer's shotgun to him as they entered the store, telling another accomplice where she could find knives in the store—which she used to slit the manager's throat before the other accomplice shot him—and taking merchandise from the store), as well as his statements

26

during and after the robbery that reflected his indifference to whether the victim lived or died, all showed "he did not act like an immature, naïve, or impulsive adolescent." (*Id.* at p. 472.)

In contrast, the court in *Pittman* held a 21-year-old's youth might have affected his culpability for felony murder where the underlying crime occurred by "happenstance," and the defendant armed himself with a chisel "spontaneous[ly]." (*Pittman*, *supra*, 96 Cal.App.5th at p. 418.) And this court in *People v. Ramirez*, *supra*, 71 Cal.App.5th 970 held a 15-year-old's "age may well have affected his calculation of the risk of death posed by using [a] firearm in [a] carjacking, as well as his willingness to abandon the crime." (*Id.* at p. 991.) In *Ramirez* we observed that the actual shooter planned the carjacking, brought and fired the gun, and insisted the defendant approach the car. (*Id.* at p. 988.) After the crime the defendant told a detective he feared retribution from the shooter's gang if he did not participate in the carjacking. (*Ibid*.)

This case is closer to *Oliver* and *Harper* than *Pittman* and *Ramirez*. There was scant evidence Williams's criminal behavior was motivated by impulse or vulnerability to peer pressure. This was a planned, armed robbery in which Williams was "in charge" and not merely taking direction from an older accomplice (Williams is two years older than Walker). Williams threatened to kill his hostages multiple times and severely beat Beharry, displaying indifference to whether Beharry lived or died. Under these circumstances it is not reasonably probable the superior court would have granted Williams's petition had the court considered that Williams was 23 years old at the time of the

27

crime.  (See *People v. Watson*, *supra*, 46 Cal.2d at p. 836; *People v. Oliver*, *supra*, 90 Cal.App.5th at p. 489, fn. 8.)[8]

## DISPOSITION

The superior court's order denying Williams's petition under section 1172.6 is affirmed.

SEGAL, Acting P. J.

We concur:

FEUER, J.

MARTINEZ, J.

---

[8]     Williams contends the superior court violated his right to due process under the Fourteenth Amendment by denying his petition arbitrarily.  Because we conclude substantial evidence supported the superior court's findings Williams was a major participant in the robbery who acted with reckless indifference to human life, the superior court's denial of Williams's petition did not violate due process.